# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LOOP, LLC, d/b/a AUTOLOOP,

                        Plaintiff,           Case No. _____

       vs.

CDK GLOBAL, LLC,               Jury Trial Demanded

                  Defendant.     **PUBLIC REDACTED VERSION**

## COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PARTIES ......................................................................................................... 13

JURISDICTION AND VENUE ........................................................................... 14

FACTUAL ALLEGATIONS ............................................................................... 16

    I.    The Relevant Product Markets ................................................... 16

        A.    The DMS Market ................................................................ 16

        B.    The Dealer Data Integration Market .................................. 20

        C.    Single-Brand Aftermarket for Dealer Data Integration on the CDK DMS ...................................................................... 29

    II.    CDK's Anticompetitive Conduct ................................................ 29

        A.    CDK's and Reynolds' Per Se Unlawful Horizontal Agreement To Eliminate Competition in the Data Integration Market ................. 29

        B.    CDK's and Reynolds' Exclusive Dealing Provisions with Vendors and Dealers ......................................................... 41

    III.    CDK's Actions Have Harmed Competition ................................. 46

        A.    Data Integration Prices Have Skyrocketed .................... 47

        B.    CDK's and Reynolds' Anticompetitive Conduct Has Tilted the Table in Favor of Their Applications to the Detriment of Competing Applications ....................................................... 53

    IV.    CDK's Anticompetitive Conduct Has No Pro-Competitive Justification .. 55

COUNT I:  HORIZONTAL CONSPIRACY IN VIOLATION OF  SECTION 1 OF THE SHERMAN ACT ................................................................... 59

COUNT II:  UNLAWFUL RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ............................................... 60

COUNT III:  UNLAWFUL TYING IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ................................................................................ 62

COUNT IV:  UNLAWFUL MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT ............................................... 63

COUNT V:  VIOLATION OF THE FLORIDA ANTITRUST ACT ........................... 64

COUNT VI:  UNFAIR PRACTICES IN VIOLATION OF THE FLORIDA
        DECEPTIVE AND UNFAIR TRADE PRACTICES ACT................................ 65

JURY DEMAND ........................................................................................... 66

PRAYER FOR RELIEF ................................................................................. 66

## INTRODUCTION

1.     Plaintiff Loop, LLC ("AutoLoop") brings this action to remedy and enjoin ongoing antitrust and state law violations by CDK Global, LLC ("CDK").

2.     As alleged herein, and supported by extensive evidence even prior to discovery, CDK and its non-party co-conspirator The Reynolds and Reynolds Company ("Reynolds") have committed flagrant antitrust violations and inflicted widespread harm on automotive dealers, vendors of software products and services (like AutoLoop), and the automotive industry as a whole.  Specifically, CDK and Reynolds have conspired to eliminate competition for providing integration with dealer data – an extremely valuable asset that belongs to dealers, but over which CDK and Reynolds have seized control.  Where there was once a robust market for providing data integration services, CDK and Reynolds – through their coordinated conduct – have destroyed that competition.  Where CDK and Reynolds once themselves competed in that market, they have now entered into a written covenant not to compete.  Moreover, where CDK and Reynolds once offered data integration services on a level-playing field, they now place artificial and anticompetitive restrictions on dealer data in order to maintain their dominance over the Dealer Management Systems ("DMS") market, favor their own products and services, and injure competing products and services such as those offered by AutoLoop.  The resulting harm to vendors and dealers has been immense.

3.     Vendors like AutoLoop are direct targets of CDK's and Reynolds' conspiracy for a simple reason:  CDK and Reynolds offer products and services that compete with AutoLoop's products.  That is, CDK and its co-conspirator Reynolds

are seeking not only to destroy and impair competition for data integration services, but, even more directly, they are seeking to impair and destroy competition for the products and services that vendors offer, and upon which dealers rely. By eliminating competition for data integration services, CDK and Reynolds have seized control over dealer data. They have thwarted dealers' ability to control access to and the usage of the dealers' own data, with no lawful or legitimate purpose. The only purposes are anticompetitive: to eliminate competition for integration services and injure competing solution providers like AutoLoop. The result is that the competitive playing field is not only uneven, but, as CDK itself has described it in internal presentations to its executive team, "tilted" in the extreme in favor of CDK.

4.     CDK and Reynolds entered into their illegal conspiracy – a conspiracy that eliminated competition for data integration services and imposed myriad restrictions on vendor access to and use of dealer data – for multiple anticompetitive reasons. First, the conspiracy is an effort to protect their duopoly in the market for DMSs and ensures that the DMS remains central to dealers, choking off the natural progression of dealer operations to more efficient and less expensive vendor software solutions. Second, having eliminated competition for providing access to dealer data, CDK and Reynolds have imposed enormously inflated fees for access to and use of that data, reaping financial windfalls to the detriment of both dealers and vendors. These enormously "bloated" fees – as one court has described them – injure vendors like AutoLoop not only because they must pay them, but also

because the fees make vendors' products and services less attractive to dealers because those dealers must ultimately bear much of the added costs. CDK's and Reynolds' own competing products and services, by contrast, do not have to pay integration fees, bloated or otherwise. Finally, as noted above, CDK and Reynolds conspired to control data integration so they could place artificial restrictions on vendors' access to and use of dealer data in order to "tilt the table" in favor of CDK's and Reynolds' own solutions, leaving competing products and services (like those offered by AutoLoop) at a disadvantage.

5. The damage to the automotive industry has been immense, with the damage to AutoLoop alone from its antitrust claims in the millions of dollars even before the automatic trebling provided for by the nation's antitrust laws. AutoLoop brings this action to recover those damages, enjoin CDK's illegal conduct, and stave off further harm to vendors, dealers, and other participants in the automotive industry. The industry and market can no longer endure such abuses.

*          *          *

6. AutoLoop is an automotive software products and services company, providing integrated software solutions for car dealers. AutoLoop's products and services make sourcing, selling, and servicing cars easier and more efficient for dealers and consumers than ever before.

7. AutoLoop provides a fully integrated dealer software system to more than 2,000 dealers across the country. AutoLoop offers three suites of software: Sales, Service, and Marketing. Each suite includes multiple software applications that dealers can select à la carte to enhance their ability to sell cars and serve customers. For example, AutoLoop's Marketing Suite includes software products such as Conquest (data-driven direct mail and email), Loyalty (a personalized customer loyalty platform), and Essentials (automated, multichannel dealer marketing campaigns). AutoLoop's Service Suite includes products such as Book (online service appointment scheduling) and SmartLane (mobile check-in and service-lane management). AutoLoop's Sales Suite includes XRM (customer relationship management), Quote (data mining and quote generation), and Newsletter (individually targeted customer newsletter production). Because all of AutoLoop's software is fully integrated, AutoLoop's products are able to share data seamlessly across all aspects of a dealer's business.

8. For AutoLoop's products and services to function, they need access to data from their dealer clients. This dealer data is the lifeblood of the automotive industry. It includes, but is not limited to, vehicle and parts inventory, customer name and contact information, customer leads, completed and pending sales information, vehicle financing and insurance ("F&I") information, vehicle pricing information, and service and repair information.

9.    Dealers have traditionally stored a significant portion of their data on a database within their DMS, which is software that dealers use to help manage their businesses (*e.g.*, accounting, sales, service, and human resources).

10.    CDK and Reynolds are duopolists in the DMS market.  Together, they control approximately 75% of the United States market by number of dealers and at least 90% when measured by vehicles sold.  CDK controls approximately 45% of the DMS market, and Reynolds controls approximately 30%.  On May 24, 2017, CDK announced that it was acquiring Auto/Mate, Inc., a company that has approximately eight percent of the DMS market, in a move that would further strengthen CDK's market power.  The Federal Trade Commission voted to block that acquisition because it would have further "reduce[d] competition in an already concentrated market."[1]

11.    In addition to their DMSs, CDK and Reynolds offer standalone software applications that compete directly with applications offered by AutoLoop and other third-party vendors.  For example, CDK's Service Edge and customer relationship management applications compete directly with AutoLoop's SmartLane and XRM products.

12.    Even though certain dealer data is stored on the DMS database, that data belongs to the dealers – as CDK and Reynolds have repeatedly admitted.  Accordingly, DMS providers, including CDK, have historically allowed dealers to

---

[1]    FTC Press Release, *FTC Challenges CDK Global, Inc.'s Proposed Acquisition of Competitor Auto/Mate, Inc.* (Mar. 20, 2018).

provide third parties (including vendors) with automated access to the dealer data stored on the DMS. Data integration service providers are companies that collect and standardize data from a dealer's DMS and provide it to the dealer's chosen third-party vendors of software products and services. Data integration services enable dealers to have their data integrated with vendor products and services. Such integration involves providing access to certain data elements, in addition to bi-directional "read" and "write" capabilities. Certain integrations offer near-real-time access to and use of dealer data, while other integrations enable periodic flow of dealer data.

13.     CDK and Reynolds each provide data integration services for their respective DMSs. CDK's service is known as Third Party Access ("3PA"), while Reynolds' service is known as the Reynolds Certified Interface ("RCI"). Third parties have also provided competing data integration services. CDK owns two such third-party data integrators – Digital Motorworks, Inc. ("DMI") and IntegraLink. Other third-party data integrators have included Authenticom, Inc. ("Authenticom") and Superior Integrated Solutions, Inc. ("SIS").

14.     At one time, both CDK and Reynolds had "open" DMSs, meaning that neither took steps to prevent dealer clients from authorizing third-party access to the dealers' own data or to place anticompetitive restrictions on rights with respect to that data. During this time, the competition between data integration services made access to dealer data cost effective – an application vendor would pay an integrator on the order of $50 per dealer per month. With dealers in control of

access to and use of their data, vendors created an array of innovative software products and services to help dealerships market, sell, lease, and service cars. These solutions became pervasive. Today, an average dealership uses 10 to 15 different software solutions.

15. Over time, Reynolds began to "close" its DMS by selectively blocking third-party data integrators from accessing dealer data stored on the Reynolds DMS. As Reynolds reduced competition for data integration services through its blocking activities, Reynolds increased the fees it charged for data integration through RCI. CDK continued to differentiate itself as an "open" DMS. As CDK's chief marketing officer publicly touted, "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data. It's ultimately the dealer's data. If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path." And at the same time, CDK's own data integration business provided vendors with access to dealer data on the Reynolds DMS. CDK's open-access policy allowed it to gain (very slowly) DMS customers at Reynolds' expense and sign those dealers to long-term contracts.

16. That competition between CDK and Reynolds halted abruptly in early 2015 when CDK began blocking dealers from granting third parties access to dealer data and, at the same time, agreed to shut down its data integration business for dealers using a Reynolds DMS. CDK's sudden about-face came as a complete

surprise to the market.  As it turned out, CDK's about-face was the result of a horizontal agreement with Reynolds.

17.     Specifically, CDK and Reynolds colluded to block third-party access to their DMSs – eliminating competition to their respective 3PA and RCI data access programs – thereby forcing third-party solution providers like AutoLoop to use CDK and Reynolds for data integration services.  Executives from both CDK and Reynolds have admitted that the companies agreed to block and thereby destroy third-party data integrators.  CDK and Reynolds also agreed to no longer compete with each other for data integration services.

18.     CDK and Reynolds memorialized one aspect of their agreement in writing, dated February 18, 2015, pursuant to which CDK agreed to "wind down" its data integration business for Reynolds dealers, and CDK and Reynolds both agreed not to access each other's DMSs.  Damningly, just before the written agreement was signed, CDK's internal documents stressed the need to "gain reciprocal agreements with DMS providers" such as Reynolds in order to destroy competition for data integration.  Dkt. No. 163, at 145:24-25.[2]

19.     Apart from the written agreement, and as detailed below, CDK and Reynolds executives have admitted to a broader agreement to destroy independent data integrators and therefore eliminate all competition to their own data

_____

    [2]    Citations to the Transcripts of the Hearing held June 26-28, 2017 in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, are referred to by their respective docket numbers (Dkt. Nos. 162-166).

integration products. These horizontal conspiracies to destroy competition and divide the data integration market are *per se* violations of the antitrust laws.

20. CDK has also imposed unlawful exclusive dealing requirements on vendors like AutoLoop. As a condition of participating in CDK's 3PA data integration service, vendors must generally agree to use 3PA exclusively for *all* of the vendors' products and services. Likewise, even though CDK's standard DMS contract expressly allows dealers to use "agents" to access data on the DMS, after entering into its horizontal agreements with Reynolds, CDK has asserted that its dealer clients are prohibited from using any third-party data integration service and has taken steps to block dealer-approved third-party access. As a result, CDK has tied the use of its 3PA data integration service to the purchase of its DMS.

21. Internal CDK documents explain the motivation behind CDK's agreement with Reynolds to eliminate competition in the data integration market. First, the enormous success of third-party products and services like those offered by AutoLoop – made possible by integration with dealer data – began to threaten CDK's and Reynolds' DMS duopoly. As dealers increasingly used these third-party products and services, they began to rely less on CDK's and Reynolds' antiquated, monolithic DMS enterprise software. The third-party products and services began to perform tasks traditionally performed by the DMS, and to do so more efficiently and while offering greater features and functionality. Dealers also began entering data directly into the third-party solutions in the first instance, bypassing the DMS completely. CDK and Reynolds knew that this would eventually make it less

difficult for dealers to switch DMS providers or even to forgo a DMS entirely. By seizing control over dealer data, CDK and Reynolds have sought to forestall that threat to their legacy DMS duopoly.

22.     Second, CDK wanted to eliminate competition for data integration so that it could limit access to dealer data, impose restrictions on usage rights contrary to the wishes of their dealer clients, limit bi-directional integration for competing products, raise the costs of those competing products (thereby giving its own offerings artificial advantages), and attempt to drive competing solutions out of the market. CDK's own documents state – and its employees have testified – that CDK wanted to leverage its duopoly control over the DMS market to "tilt the table" in favor of its own offerings.

23.     For example, CDK prevents AutoLoop's SmartLane product from creating or modifying "repair orders" in the DMS. Yet CDK's Service Edge application has this capability, and CDK touts this fact to potential dealer clients: its marketing materials state that CDK's Service Edge has a "workflow [that] is written into the DMS," eliminating the "need to do the same work twice," while competitors like SmartLane are denied that capability. An application's ability to open repair orders and allow customers to sign for repairs in the service lane is a desirable feature, which CDK intentionally withholds to "tilt the table" in favor of its own competing applications.

24.     CDK also abuses the 3PA "certification" process to the detriment of third-party vendors. AutoLoop joined the 3PA program in January 2016, and was

required to begin paying CDK's bloated integration fees six months later. Two years into that contract, CDK still has not certified five of AutoLoop's seven products. AutoLoop thus has been double paying for integration – to CDK (for no service at all) and to an independent integrator (which CDK continues to allow). This shows CDK's only motive for the 3PA program is profit. As long as third-party vendors pay CDK, CDK does not care which data integrator third parties use. In addition, CDK has demanded that third-party vendors provide sensitive proprietary information about their products for no legitimate reason. For example, CDK has required AutoLoop to provide live demonstrations of its solutions to CDK employees, which AutoLoop would never provide for any other competitor.

25.     Even where CDK and Reynolds grant competing applications access to data or provide a given integration, they still impose anticompetitive restrictions on the use of that data. For example, AutoLoop pays CDK a per dealer per month fee for data integration for each product and service, yet CDK contractually prohibits AutoLoop's various products and services from sharing that data with each other – despite having paid for it multiple times over. There is no legitimate basis for CDK or Reynolds to withhold those data sharing rights – especially where dealers want and authorize such rights – except to stifle innovation and make AutoLoop's products and services more expensive.

26.     Such rights restrictions are especially nefarious because AutoLoop already has secured the necessary rights to the data in question – whether from the

dealers, consumers, or other third-party originators of the data. In many instances, much of the data in the DMS originated in AutoLoop's own products and services.

27. Third, CDK saw an enormous financial opportunity to dramatically inflate its prices for data integration services – after it had eliminated the competition. AutoLoop's integration fees have skyrocketed from approximately $79 per month per rooftop with independent data integrators to more than ███ per month per rooftop with CDK.

28. By charging monopoly prices for access to dealer data, CDK has also raised the input costs of rival solutions, including those offered by AutoLoop. Having seen the costs of data access skyrocket – with no corresponding increase in functionality or service quality – AutoLoop has had no choice but to pass through a portion of the additional costs to its dealer clients. Unable to afford the escalating pass-through data integration fees, many dealers have elected to reduce their use of AutoLoop's products or forgo them altogether, often in favor of the competing CDK offering, even though AutoLoop's products and services are superior. Therefore, CDK's dramatic price increases after it entered into the conspiracy with Reynolds not only padded its bottom line, but also put competing solutions providers like AutoLoop at a severe competitive disadvantage in the marketplace.

29. AutoLoop brings this action to recover the damages it has suffered at the hands of CDK's and Reynolds' anticompetitive conduct – as co-conspirators, CDK is equally liable for the damage caused by Reynolds – and to restore choice to dealers and vendors over data integration. As described in detail herein, CDK's and

Reynolds' horizontal conspiracies to eliminate competition in the data integration market and their market division agreement (which is a covenant not to compete) are per se violations of Section 1 of the Sherman Act, *see infra* Count I; CDK's exclusive dealing arrangements with vendors and dealers are patently anticompetitive and unlawful under Section 1 of the Sherman Act, *see infra* Count II; the illegal tying of CDK's integration service to its DMS service is unlawful under Section 1 of the Sherman Act, *see infra* Count III; CDK's monopolization of its Dealer Data Integration aftermarket is unlawful under Section 2 of the Sherman Act, *see infra* Count IV; the same conduct that violates the Sherman Act also violates state antitrust and unfair competition laws, *see infra* Count V; and the anticompetitive restrictions that CDK places on competing products and services with respect to access to certain data elements, usage rights, and bi-directional integration – its "tilt-the-table" strategy – independently violates state unfair competition laws, *see infra* Count VI.

## PARTIES

30.   Plaintiff AutoLoop is a private Florida limited liability company with its headquarters and principal place of business at 33 N. Garden Avenue, Clearwater, Florida 33755.  AutoLoop was founded by entrepreneur Steve Anderson in 2005.  Today, AutoLoop employs 400 people, and its products are used by more than 2,100 dealers.

31.   Defendant CDK is a publicly traded Delaware corporation with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169.  CDK provides DMS software and services to

automobile dealerships throughout the United States and has more than $2 billion in annual revenue. In 2014, CDK was spun off from ADP, LLC, and is now an independent, publicly traded company. Prior to the spin-off, CDK was referred to as ADP Dealer Services (collectively, referred to herein as "CDK"). In addition to its DMS platform, CDK also provides data integration services, and offers products and services that compete directly with AutoLoop's solutions, including Service Edge (which competes with AutoLoop's SmartLane product) and customer relationship management services (which compete with AutoLoop's XRM).

32.     Non-party Reynolds is an Ohio corporation with its corporate headquarters and principal place of business at One Reynolds Way, Kettering, Ohio 45430. Because Reynolds is CDK's co-conspirator, CDK is jointly and severally liable for all harm caused by Reynolds in furtherance of the conspiracy. Like CDK, Reynolds provides DMS software and services to automobile dealerships throughout the United States. Also like CDK, Reynolds provides data integration services, as well as products and services that compete directly with AutoLoop's solutions. Reynolds was acquired by Bob Brockman in 2006 in a leveraged buyout and taken private.

## JURISDICTION AND VENUE

33.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and state law.

34.     This Court has subject matter jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4, 12, and 16 of the

Clayton Act, 15 U.S.C. §§ 15, 22 and 26. This court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because they are so closely related to the federal claims that they constitute part of the same constitutional case.

35.     This Court has personal jurisdiction over Defendant CDK pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d) because CDK was served with process in this district. Furthermore, CDK has engaged in the unlawful acts described in this Complaint with the foreseeable or intended effects of causing substantial economic harm to AutoLoop in Wisconsin, and CDK has purposely availed itself of the privilege of doing business in Wisconsin through the widespread promotion, sale, and distribution of their products and services in the State. Many dealers in Wisconsin use CDK's DMS and/or its applications.

36.     Venue is proper in the Western District of Wisconsin pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).[3] Defendant CDK is registered to do business, transacted business, was found, and had agents in Western District of Wisconsin; a substantial part of the events giving rise to AutoLoop's claims occurred in the District; a substantial portion of the affected interstate trade and commerce described herein

---

[3] Pursuant to the Court's instructions at the April 6, 2018 status hearing in *In re Dealer Management Systems Antitrust Litigation*, No. 18 C 864 (MDL No. 2817), AutoLoop has filed this Complaint directly in the MDL court but requests that the Complaint be deemed filed in the Western District of Wisconsin and transferred to the Western District of Wisconsin for trial.

has been carried out in the District. AutoLoop has also served dealers in Wisconsin that use a CDK or Reynolds DMS.

37. CDK's unlawful conduct substantially affected interstate commerce by harming competition, increasing prices and quality, and limiting output, to the detriment of AutoLoop, dealers, and other vendors nationwide.

## FACTUAL ALLEGATIONS

### I. The Relevant Product Markets

38. The relevant product markets for AutoLoop's claims are: (1) the DMS market in the United States; (2) the dealer data integration market in the United States; and (3) the CDK Dealer Data Integration Single-Brand Aftermarket.

### A. The DMS Market

39. The DMS is enterprise software used by retail automotive dealerships to manage their business, including sales, financing, inventory management, repairs and service, accounting, payroll, human resources, and marketing.

40. The DMS also includes a database used to store certain dealer data, including vehicle and parts inventory, customer name and contact information, completed and pending sales, sales and F&I information, service and repair information, and more.

41. Over time, the DMS became the center of a dealer's retail management platform. Virtually every franchised new car dealership in the United States now uses a DMS. And while dealers generate much of their data outside of the DMS in separate software solutions, as a practical matter, a substantial portion of dealer

data is stored on the DMS, even though there is no technical reason why that must be the case.

42.     The DMS market is comprised of those providers that market and sell DMS services to franchised new car dealers in the United States.  There is public and industry recognition of the DMS market.

### 1.     CDK and Reynolds Dominate the DMS Market

43.     Defendant CDK and its co-conspirator Reynolds dominate the DMS market.  About 45% of dealer "rooftops" (i.e., franchised stores located at a physical location) use CDK's DMS, and about 30% use Reynolds' DMS.  When measured using the number of vehicles sold from franchised dealers, which is a more relevant metric, CDK and Reynolds control more than 90% of the DMS Market.  Industry publications have described CDK and Reynolds as "the Big 2," "the Duopoly," "the two 400-pound gorillas," and "the two giants of the DMS market."

44.     On May 24, 2017, CDK announced an agreement to buy the DMS provider Auto/Mate, Inc., which has an additional eight percent of the DMS market (as measured by dealer rooftops).  On March 20, 2018, the Federal Trade Commission voted to block that acquisition because it would have further "reduce[d] competition in an already concentrated market."[4]  CDK subsequently abandoned the attempted acquisition.

---

[4]     FTC Press Release, *FTC Challenges CDK Global, Inc.'s Proposed Acquisition of Competitor Auto/Mate, Inc.* (Mar. 20, 2018).

45.     Apart from CDK and Reynolds, the DMS market is diffuse, with an array of providers dividing up the remaining market share.  The remaining DMS providers are generally small, occupy a particular niche, or serve the country's smaller car dealerships.

46.     CDK's and Reynolds' DMS businesses are very lucrative.  A single, small dealership pays up to $150,000 per year for the DMS software license and services.  Mid-size dealership groups (5 to 10 stores) pay $1,500,000 or more per year, and large dealership groups can easily pay more than $5,000,000 per year. CDK's and Reynolds' profit margins on their DMSs are estimated to exceed 40%.

### 2.     The CDK and Reynolds Duopoly Has Proven Durable

47.     Significant barriers to entry protect CDK's and Reynolds' dominant positions in the DMS market.  First, CDK and Reynolds have locked in dealers to lengthy contracts.  CDK and Reynolds sell their respective DMS software and services pursuant to long-term contracts that are typically between five and seven years in length.  These contracts often include automatic extensions if new services are ordered in the middle of the contract.

48.     Second, switching costs are high.  Switching DMS providers presents significant logistical challenges and is highly disruptive to business operations.  It can take a dealership over a year of preparation, staff training, and testing before a new DMS can be put into operation, all while the dealership is trying to sell and service cars.  The financial costs in terms of training and implementation are significant.

49. One industry executive stated that changing DMS providers "is akin to a heart transplant." David Barkholz, *DMS Dilemma: Why It's So Hard to Switch – Upstarts Battle Big 2, But Dealers Weigh Cost vs. Comfort Zone*, Automotive News (May 10, 2010). CDK's CEO recently acknowledged that "switching DMS providers can be very difficult. It [is quite a] process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch." Thomson Reuters StreetEvents, *Edited Transcript: CDK – Q1 2017 CDK Global Inc. Earnings Call*, at 3 (Nov. 2, 2016) (statement by CDK Global CEO Brian MacDonald). One large dealer publicly referred to changing DMS providers as "mission impossible." David Barkholz, *Inside 'Mission Impossible': A DMS Change – How Store Succeeded in Sign-or-Switch Situation*, Automotive News (January 13, 2014). Both Reynolds and CDK have publicly touted that their market positions are secure because of how difficult it is to switch DMS providers. As a result of the high-switching costs, the *average* DMS tenure is over twenty years.

50. CDK has recently forced many of its dealers to extend their contracts by years by threatening to terminate their DMS service. Many of these dealers were on month-to-month contracts, and had been for a long time. CDK abruptly – and without prior notice – informed these dealers that their DMS services would terminate in less than 60 days unless the dealers entered into years-long contracts. Dealers generally had no choice but to sign the lengthy extensions given the impossibility of switching DMS providers in such a short amount of time.

51.     The barriers to entry are so high that even Microsoft could not compete in this market.  When Microsoft tried to enter the DMS market in 2006, Reynolds' CEO Bob Brockman was not concerned, saying "there's not a chance" that Microsoft could succeed.    David Barkholz, *Data System is Brockman's Latest Surprise,* Automotive News (Jan. 25, 2009).  Indeed, Microsoft failed, prompting a company executive to publicly concede, "We kind of got ahead of ourselves" in trying to take on CDK and Reynolds.   David Barkholz, *Dealers Get New Management System Option – Dominion-Microsoft Product Battles Giants ADP, Reynolds*, Automotive News (Dec. 2, 2012).

**B.     The Dealer Data Integration Market**

52.     Dealers use software products and services from AutoLoop (and many other vendors) to perform important sales, servicing, marketing, and operational functions.  These solutions supplement and oftentimes replace functions provided by the DMS.  AutoLoop's products and services are used for, among other things, customer relationship management, service lane management, lead generation, data mining, and multiplatform marketing.  A dealer may use 10 to 15 standalone products and services, and some use many more.

53.     To function, these solutions need integration with dealer data stored on the DMS.  For example, XRM is a customer relationship management tool that requires access to, among other things, customer information, vehicle information and history, and inventory data.

54.     The data needs of vendor solutions vary.  Some need only periodic data extraction.  However, it has become increasingly common for vendor solutions to

need real-time bi-directional access to dealer data on the DMS – i.e., they need to read data from the DMS in near-real-time, as well as push data back into the DMS near-real-time in the many instances where that data is first generated within the vendor solution (i.e., outside of the DMS). For example, AutoLoop's SmartLane product needs real-time, updated data on scheduled service and repair orders and the inventory of parts available for those appointments.

55.     As described in more detail below, even though certain dealer data is stored on the DMS, that data belongs to the dealers, and dealers have the right to provide that data to third parties and to establish use and sharing rights for the data.

56.     The Dealer Data Integration Market consists of services that provide access to dealer data on the DMS, including CDK's and Reynolds' own in-house data integration services. Data integrators may also provide value-enhancing services, such as putting data from different DMS in a uniform format, data hygiene (i.e., error correction), and granular control by dealers over which vendors receive which data.

57.     Before a data integrator can access dealer data on the DMS, the data integrator must receive specific authorization from the dealer. To grant such access, dealers enter into contracts with data integrators that authorize the data integrator to access the dealer's data.

58.     There is public and industry recognition of the existence of a dealer data integration market distinct from the DMS market. CDK and Reynolds have

separate business units that provide data integration and DMS services. In its 2015 10-K, CDK described its data integration services as "a stand-alone product" separate from "the core Dealer Management System." CDK, Annual Report (Form 10-K) (Aug. 13, 2015), at 4. The Dealer Data Integration Market also has its own supply and demand curves. The usage of integrated vendor solutions – and hence the amount of data integration services – has fallen relative to what it would be in a competitive market in response to supra-competitive prices charged for data integration services by CDK and Reynolds because a significant portion of those costs are passed through to dealers. There are also no reasonable substitutes for services provided by data integrators, demonstrated most clearly by the fact that CDK and Reynolds, after closing their systems, have been able to impose massive price increases for their data integration services.

59.     Geographically, the Dealer Data Integration Market covers the United States.

### 1.     The Dealer Data in the DMS Belongs to the Dealers

60.     Even though certain dealer data is stored on the DMS, that data still belongs to the dealers. The dealers therefore should decide who to authorize to access their data. CDK and Reynolds have repeatedly admitted this fundamental fact in public statements, on their websites, and in their DMS contracts with dealers.

61.     Tom Schwartz, Reynolds' chief spokesperson, publicly declared: "The data belongs to the dealers. We all agree on that." David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News (Nov. 21, 2011). On its website, Reynolds

represents to dealers: "Your Data, Your Way. You own your data. Reynolds recognizes you need to share that data outside your dealership."

62. Howard Gardner, now CDK's Vice President for Data Strategy, has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others." CDK's website likewise states: "[D]ealerships own their data."

63. The Reynolds and CDK DMS contracts "spell out which party owns the data and there is generally little dispute: the data belongs to the dealer. This makes sense; after all, it's the dealership's customers, inventory, and transactional data that the dealership is putting into the DMS system." DrivingSales News, *The Hidden Data Tax That Dealers Don't Know They Are Paying,* Driving Sales (Oct. 17, 2013); *see* Reynolds Addenda Specific Terms and Conditions, at 3 █████

████████████████████████████████████████████████████████

███████████████████████████ ; CDK Master Services Agreement § 7.A ████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

### 2. CDK Has Long Recognized That Dealers Have the Right To Control Access to, and Use of, Their Data

64. For many years, CDK publicly recognized the fundamental principle that dealers, as owners of their data, have the right to control access to and use of that data.

65. CDK's standard DMS contract states a dealer's "employees and agents" may "have access" to the DMS. This language has existed since at least the 1990s.

CDK's standard DMS contract therefore specifically permits dealers to grant their agents, including data integrators, access rights to the dealer's data stored on the DMS.

66. Consistent with this contractual language, CDK's top executives have repeatedly made public statements that dealers may grant data integrators rights to access their DMS.  For example, Steve Anenen, CDK's longtime CEO, publicly stated that dealers have the right to grant third parties access to, and use of, their data.  He told the industry publication *Automotive News*, "We're not going to prohibit that or get in the way of that."  Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News (Feb. 19, 2007).  "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer.  As long as they grant permission, how would you ever go against that wish?"  *Id*.

67. Matt Parsons, CDK's vice president of sales and marketing, similarly stated:  "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system.  That is the dealer's right.  We have no right to tell them they can't do that."  Ralph Kisiel, *NADA, AIADA Weigh Reynolds Data Security Debate*, Automotive News (Feb. 4, 2007).  Kevin Henahan, CDK's senior vice president of product marketing, delivered the same message:  "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data.  It's ultimately the dealer's data.  If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do.  So

we're not going to go down this path." Ralph Kisiel, *Dealer Security Stirs Insecurity: Vendors Wary of Reynolds Plan for Computer Systems*, Automotive News (Dec. 4, 2006).

68.     CDK was also one of the first members of Open Secure Access, Inc., which described itself as "a coalition of companies that believe dealers should control access to the data they own and determine how it is used." Open Secure Access, Inc. Press Release, *Open Secure Access Releases Automotive Retail Data Security Guidelines* (June 28, 2007). The group published a set of basic principles to guide the industry, including that "dealers should control who accesses their data," "[t]hird parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company," and "DMS companies should facilitate interaction with all data available to a DMS user by providing technologically advanced means to interact with (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database."

### 3.     Participants in the Data Integration Market

69.     At one time, there were approximately a dozen competitors in the Dealer Data Integration market, such as SIS and SelectQu. CDK's and Reynolds' anticompetitive behavior has driven most of them out of the market. Today, there are only three remaining commercial data integrators serving CDK's and Reynolds' dealers: Reynolds through RCI, CDK through 3PA, and Authenticom. Every independent data integration provider other than Authenticom has been driven from the market by CDK's and Reynolds' anticompetitive conduct. Subject to its

own litigation against CDK and Reynolds, Authenticom's ability to remain in business is in doubt. Therefore, vendors like AutoLoop effectively only have one integration option with respect to dealer data on a CDK DMS – CDK itself. It is the same with Reynolds.

### a. CDK

70. CDK provides integration with dealer data on the CDK DMS through an interface offered by CDK under its Third Party Access ("3PA") program. The 3PA program's managed interface is used exclusively for data integration with the CDK DMS.

71. Prior to early 2015 – when CDK colluded with Reynolds to "close" its DMS – CDK offered several ways by which dealers could share their data. For example, CDK offered a "basic access" package where dealers supplied vendors with a user ID and password by which the vendors – or their data integrators – could access dealer data on CDK's DMS. Before 2015, CDK also allowed dealers to use other data integrators that competed with 3PA.

72. CDK revamped the 3PA program in June 2015. Under the "refreshed" 3PA program, CDK declares that the 3PA program's managed interface is the only CDK-approved method of integrating with a CDK DMS. It now labels any other method for accessing data "unauthorized," and it disables login credentials that any dealer provides to a third party. Today, CDK disables login credentials used by third-party data integrators even though its own dealer contracts specifically permit access by "agents" of the dealers.

73.     CDK also owns two third-party data integrators, DMI and IntegraLink.  DMI and IntegraLink obtain authorization from dealers to pull data from the dealer's DMS in the same way as other data integrators and provide that data to vendors.

74.     At the time CDK acquired DMI in 2002, CDK stated:  "As a result of its acquisition of Digital Motorworks, [CDK] now has the ability to extract, transform and standardize data from varied sources to client specifications."  DMI claims to work with over 100 vendors and pull data from thousands of dealerships.

75.     CDK acquired IntegraLink in 2010.  IntegraLink "specialize[s] in the collection of data from automotive retailers' dealership management systems."  IntegraLink was founded in 1998 by Kevin Distelhorst, Reynolds' former director of online services and currently a vice president at CDK.

76.     For over a decade, DMI and IntegraLink provided data integration services for CDK itself and a variety of other DMS platforms, including Reynolds.  AutoLoop had used these data integration services for some of its products and services.   CDK, however, largely discontinued these services once CDK and Reynolds entered into their February 2015 agreement not to compete, which is described below.   Now, DMI and IntegraLink primarily provide data integration services for non-Reynolds and non-CDK DMSs.   For these non-dominant DMSs, dealers provide CDK with login credentials or a secure connection for direct data transfers, such as an API.  DMI and IntegraLink charge vendors only $25 to $50 per dealer per month.

### b. Reynolds

77. Reynolds provides integration with dealer data on the Reynolds DMS through its RCI service, which is Reynolds' equivalent to 3PA. Like the 3PA program, RCI is now the only means by which vendors are allowed to integrate with dealer data on Reynolds' DMS. Reynolds does not have a data integration service that works with other DMS platforms.

### c. Authenticom and Other Independent Integrators

78. Authenticom was founded in 2002, introduced its data integration service in 2004, and has served more than 15,000 dealers.

79. Authenticom provides data integration services for all available DMS platforms – including Reynolds and CDK. Authenticom is the last significant independent data integration provider in the market.

80. Authenticom's standard pricing to pull data is $25 per dealer per month for the first data set, and then $50 per dealer per month for two or more. According to Authenticom, the average price a vendor pays to pull data is between $30 and $40 per dealer per month. For bi-directional integration, Authenticom has charged at most $75 per dealer per month, and that price included additional services like data hygiene.

81. Apart from Authenticom, there were once many other independent integrators in the market – such as SIS, SelectQu, and others – before CDK and Reynolds drove them from the market.

### C. Single-Brand Aftermarket for Dealer Data Integration on the CDK DMS

82. The Dealer Data Integration Market for dealers using CDK's DMS is a brand-specific aftermarket. This market is derivative of the primary DMS market.

83. When dealers purchase the CDK DMS platform, they are locked in to that purchase because of high switching costs as described above.

84. Dealers also lack information necessary to assess accurately the true cost of using CDK's DMS. CDK had historically been an "open" DMS where there were multiple competing data integration providers. Dealers could not know in advance that CDK would collude with Reynolds to "close" its DMS, thereby causing data integration prices to skyrocket, a portion of which is passed through to dealers.

85. Because of these market imperfections, CDK is profitably charging supra-competitive prices for dealer data integration on its DMS. That CDK has been able to impose such large price increases for integration services on its DMS demonstrates that there are no reasonable substitutes for that service.

## II. CDK's Anticompetitive Conduct

### A. CDK's and Reynolds' Per Se Unlawful Horizontal Agreement to Eliminate Competition in the Data Integration Market

#### 1. CDK's DMS Was "Open" Prior to 2015

86. Third-party access was a key point of competition between CDK and Reynolds. Prior to 2015, CDK publicly touted its open system as one of the competitive advantages of its DMS. As noted above, CDK repeatedly vowed (including in public statements by its CEO and top marketing officers) that it would not block third parties, including data integrators, from accessing dealer data on its

DMS. CDK issued press releases stressing that it "believes in the fair competitive environment and does not use its leverage through supply of the dealer management system to reduce competition through the restriction of data access." By contrast, in 2009, Reynolds began selectively blocking third-party access, and increased its blocking efforts in 2013.

87. CDK was successful in marketing its "open" DMS as a competitive advantage over the Reynolds DMS, and dealers purchased DMS services from CDK based, in part, on CDK's public representations and unchanged contractual language allowing for such access. As a result, CDK very slowly gained market share from Reynolds. Over a decade, Reynolds' DMS market share declined from about 40 to 30 percent, with most dealers leaving Reynolds for CDK.

88. That competition between CDK and Reynolds abruptly halted in 2015, when CDK suddenly "closed" its system. Given CDK's unequivocal public statements (and the unchanged DMS contractual language allowing for "agent" access), CDK's abrupt about-face came as a complete surprise to AutoLoop and to the market. Before 2015, AutoLoop used SIS to access data for dealers using the CDK DMS. But after CDK elected to close its system, CDK made every effort to ensure that AutoLoop and other vendors could only integrate with dealer data through CDK's 3PA program. CDK's about-face was the result of a horizontal agreement with Reynolds.

2. **CDK "Closed" Its DMS in 2015 After Entering into an Agreement with Reynolds To Eliminate Competition in the Data Integration Market**

   a. **CDK's Internal Documents Reveal Its Motivation for Colluding with Reynolds**

89.    In 2014, CDK decided that it wanted to capture more value for itself by charging dramatically increased rates for integration with dealer data.  Prior to entering into its unlawful agreements with Reynolds, CDK charged on average $70 per dealer per month for integration.  Dealers could choose methods of access on a vendor-by-vendor basis, giving dealers flexibility in managing how their vendors obtained data and the costs that would be passed through to the dealers.  But by closing its DMS, CDK saw an opportunity to impose huge price increases on its data integration services – increasing CDK's profits while also advantaging its competing products and services by raising the input costs and decreasing the integration available to its rivals.  Internal CDK presentations specifically recognized the "risk of vendors willing to move" to competing data integrators "instead of accept increase price" if those competing integrators were allowed to continue to provide their services. Dkt. No. 163, at 134:11-15.

90.    In addition, CDK believed that destroying competition for data integration and subsequently raising prices for data integration would help address the threat posed by standalone products and services to the primacy of the DMS to a dealer's operations.  The growth of standalone solutions – especially sales and service customer relationship management applications – have threatened to reduce the importance of the DMS as dealers increasingly manage their operations through

the standalone solutions outside of the DMS. Moreover, many of those solutions are where dealers generate much of their data in the first instance – for example, customer relationship management software products are often where dealers first capture and store information about their customers and sales transactions – and, as those products are able to host and manage a dealer's data, the DMS again loses its importance. By "closing" its DMS and raising the input costs for standalone solutions, CDK has sought to forestall the growth of those solutions, which is what would naturally occur absent the anticompetitive restraints.

91. Finally, CDK sought to advantage its own offerings that compete with products and services provided by other vendors like AutoLoop. Destroying competition for data integration gave CDK control over competing service providers' access to, and ability to use and update, dealer data. CDK recognized that it could "tilt the table" in favor of its own applications by withholding needed data access, imposing use restrictions, and limiting write permissions for certain data elements. CDK's actions have disrupted the workflow of competing solutions, and denied data access completely for some competing offerings.

92. Internal CDK strategy documents reveal the specific purposes of CDK's conspiracy with Reynolds. According to CDK, "One of the 3PA Program's principles was to protect CDK products through a tilt-the-table approach." Dkt. No. 163, at 140:13-15. By "tilt the table," CDK meant it would advantage its products and services over those of third-party vendors by providing itself greater access and use rights to dealer data. CDK intended to keep an "advantage to CDK-layered

applications" as compared to third-party solutions, providing additional "margin" that could be achieved through a "closed" system. *Id.* at 139:2-7.

93. For example, CDK's own documents show that it sought to "disrupt the workflow" of competing applications and services, and of those that compete with CDK's own "service workflow application[s]" in particular. This includes AutoLoop's SmartLane application. Although CDK's Service Lane is able to create and modify repair orders, CDK does not permit SmartLane to do so. There is no bona fide justification for that limitation other than to disadvantage competing applications, and thereby to allow CDK to gain market share that it could not obtain on the merits of its products.

94. In order to achieve these aims, as CDK's internal documents acknowledged, CDK needed Reynolds' cooperation. In an October 2014 presentation, CDK stated that it needed to enter into "***reciprocal agreements with DMS providers***," including specifically Reynolds, in order to eliminate competing data integrators. And Reynolds needed CDK to close CDK's system to reduce the number of dealers leaving Reynolds for CDK on the basis of CDK's previously "open" system. Moreover, with the two dominant DMS providers agreeing to block independent integrators, it would be impossible for competing data integrators to survive. CDK thus contemplated reaching an agreement with Reynolds to reduce, and ultimately eliminate, competition for integration to dealer data.

### b. CDK and Reynolds Agreed To Divide the Market and Block Independent Integrators

95.     A few months later, in early 2015, CDK and Reynolds entered into agreements designed to eliminate competition in the provision of dealer data integration services.  First, in February 2015, CDK and Reynolds entered into three written agreements in which they promised not to compete in providing data integration services and, in their capacity as providers of proprietary applications and services, not to use the services of independent integration service providers to obtain data from the other's DMS.  Second, CDK and Reynolds further agreed that each would block independent integrators' access to their DMS customers' data, in an effort to drive independent integrators from the market entirely.

### i. The Market Division Agreement and Data Integration Agreements

96.     **Market Division Agreement.**  Effective February 18, 2015, CDK and Reynolds entered into three written agreements.  The centerpiece was a so-called "Data Exchange Agreement" – also referred to as a "wind-down" agreement – pursuant to which CDK agreed to wind down its data integration business on the Reynolds DMS, with Reynolds promising not to block CDK's access to the Reynolds system during the wind-down period, which might last as long as five years – until the year 2020.  *See* Data Exchange Agreement § 1.4.  During that period, Reynolds agreed that CDK could continue to extract dealer data just as it had before, using login credentials provided by the dealer.  *See id.* § 4.3.  As for other independent integrators, CDK and Reynolds agreed that they would not "take any steps to assist

any person that it reasonably believes to have plans to access or integrate with the other party's DMS." *Id.* § 4.5.

97. CDK and Reynolds also agreed that they themselves would no longer access data on each other's DMS. *Id.* (agreeing to "[p]rohibition on . . . DMS Access"). Specifically, the agreement states: "For the avoidance of doubt, this Section 4.5 is not intended as a 'covenant not to compete,' but rather as a contractual restriction of access and attempted access." *Id.* This restriction lasts forever. *See id.* § 6.1. Reynolds' own top executive confirmed that Section 4.5 prohibits CDK and Reynolds from accessing each other's DMS. Robert Schaefer, Reynolds' Vice President of Data Services, has testified under oath to the following: "Q: In this contract by its plain term Section 4.5, Reynolds agreed not to access the CDK DMS; isn't that right? A: That would be correct." Dkt. No. 163, at 76:6-9. Mr. Schaefer offered similar sworn testimony with respect to CDK's prohibition on access of Reynolds' DMS. *Id.* at 73:11-16; 75:16-76:1.

98. Further, the agreement also mandated coordination between the competitors in transitioning all of CDK's vendor clients (*i.e.*, those vendors for which CDK provided access to dealer data on the Reynolds DMS) into the Reynolds RCI program. *See* Data Exchange Agreement § 4.4. The agreement specifically required CDK to "cooperate with Reynolds" in the "transition of [CDK] customers to the Reynolds RCI program with respect to Reynolds Dealers." *Id.* In connection with that effort, CDK agreed to give Reynolds full information about the vendors CDK served, including their name, DMS number, store number, branch number,

user login, specific data access provided by CDK, data interfaces, the frequency of the data provided, the deadlines for data delivery, the format of the data, and more. *See id.* § 4.3, Exhibit DEA-2. Absent an agreement not to compete, CDK would treat this information as a highly confidential customer trade secret and would not share it with rivals. Indeed, Mr. Schaefer of Reynolds admitted under oath that Reynolds would never share such highly sensitive information with a competitor absent an agreement with that competitor.

99. Consistent with the agreement to cooperate in transitioning customers from CDK to Reynolds, CDK sent letters to its vendor customers with a "roadmap" and "deadline" for joining Reynolds' integration program. On March 2, 2015, CDK sent a letter to its vendor clients announcing that the vendors "will be provided with a roadmap to transition to the [RCI] program without any further risk of interruption to existing services." CDK explained that "we are in a transition period to allow time for [DMI] clients to enroll in the RCI program in support of your [Reynolds] dealers," and that "we will assist you to facilitate a smooth transition." The letter noted that Reynolds had "agreed to protect the current DMI process for collecting data from [Reynolds] dealers during this transition" and promised "a more detailed letter within the next couple of weeks that outlines the transition process."

100. On April 1, 2015, CDK sent a follow-up letter to its vendor customers. The letter began: "As announced earlier this month, the recent business agreement between CDK Global and The Reynolds and Reynolds Company (R&R) provides for

the clients of Digital Motorworks, Inc. (DMI) a streamlined process to enroll in the Reynolds Certified Interface (RCI) program for their R&R dealers. We are now in the transition period to allow sufficient time for this enrollment, and R&R has agreed to provide a grace period for the existing DMI process for R&R data collection during this time."

101. Reynolds followed up CDK's letters with its own communications. Reynolds has also pushed vendors to use DMI and IntegraLink during the wind down, and away from other third-party providers, in order to drive competing data integration providers completely out of the market.

102. **Integration Agreements.** Two additional written agreements between CDK and Reynolds "granted reciprocal access" to each other's data integration products – via the 3PA and RCI programs, respectively. Under the agreements, CDK's proprietary products and services could integrate with data on Reynolds DMSs via RCI, and vice versa. Reynolds received five free years of 3PA integration from CDK, while CDK pays for the data integration services from Reynolds. Moreover, by signing up for 3PA, Reynolds agreed that it would integrate with data on CDK's DMSs exclusively through 3PA, and not obtain data for its products and services from anywhere else. CDK agreed to the same in its integration contract with Reynolds for the RCI program.

   ii.  **Top Executives at CDK and Reynolds Have Admitted That They Agreed To Block Third-Party Access**

103. In addition to the written agreements, senior CDK and Reynolds executives also have admitted that they have agreed to restrict access to dealer data

and destroy data integrators like Authenticom, SIS, and others. During a phone conversation with Steve Cottrell – Authenticom's founder and CEO – in May 2015, Mr. Schaefer of Reynolds said that Reynolds had "made agreements with the other major DMS providers" – there is only CDK – "to support each other's third-party access agreements *and* to block independent integrators such as Authenticom." Dkt. No. 164, at 139:6-13. Mr. Schaefer said that Reynolds' owner, Bob Brockman, was "adamant" that all third-party data integrators must be cut off. *Id*. As a result, Mr. Schaefer said that Authenticom should wind down its operations and leave the market. *Id*. at 138:3-139:19.

104. A top executive at CDK delivered the same message to Mr. Cottrell. *Id*. at 140:1-143:1. On April 3, 2016, at an industry convention in Las Vegas, Dan McCray (CDK's former Vice President of Product Management) stopped by Authenticom's booth to talk with Mr. Cottrell, who was occupied with a customer. *Id*. After Mr. Cottrell finished with the customer, he walked to CDK's booth, where he saw Mr. McCray "standing off to the side" with "three other individuals." *Id*. After cordial greetings, Mr. McCray took Mr. Cottrell by the arm and said, "Let's take a walk." *Id*. Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area. *See id.* Mr. McCray then confirmed the existence of the illegal agreement, stating that CDK and Reynolds had agreed to "[l]ock you and the other third parties out," and that they were "working collaboratively to remove all hostile integrators from our DMS system." *Id*. at 140:1-143:1. Mr. McCray then grew threatening: "I wanted to look you in the eye and let you know

man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems." "For god's sake," he concluded, "you have built a great little business, get something for it before it is destroyed otherwise I will f***ing destroy it." Mr. Cottrell rejected Mr. McCray's threats, and insisted that Authenticom would continue to serve its dealer and vendor customers.

105. CDK and Reynolds even have employees actively working together to coordinate the technical aspects of blocking third-party access. In December 2016, during one particular vendor's discussions with CDK about joining the 3PA program and leaving Authenticom, Steve French – CDK's senior director of client and data services – told the vendor that a large portion of his job was to work with Reynolds to ensure third-party data integrators like Authenticom remain locked out. Mr. French suggested that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to lock out third-party access.

106. CDK's and Reynolds' conspiracy was formed and implemented by top-level executives at each company. For CDK, the leading actors in the conspiracy include Robert N. Karp, the President of CDK North America and the person with oversight of CDK's 3PA program; Howard Gardner, CDK's Vice President and Manager of Data Strategy and the person who took the lead on the February 2015 agreement; Dan McCray, CDK's recently retired Vice President of Product Management; Ron Workman, CDK's Senior Vice President of Global Corporate Development, who signed the February 2015 agreement; Kevin Distelhorst, CDK's Chief Customer Officer, the founder of IntegraLink, and a former executive at

Reynolds; and Malcolm Thorne, CDK's former Chief Global Strategy Officer and the person who took the lead on spearheading the changes to 3PA in 2014 and 2015.

107. For Reynolds, the leading actors in the conspiracy include Bob Brockman, Reynolds' Owner, Chairman, and CEO and the person who approved and executed the February 2015 agreement and formulated the policy to eliminate competitive data integrators through blocking; and Robert Schaefer, Reynolds' Vice President of OEM Relations, Data Services, and Security, the person in charge of the RCI program.

### iii. CDK and Reynolds Implemented the Agreement with Aggressive Blocking

108. In the wake of their agreements, CDK and Reynolds have aggressively blocked data integrators and other third parties from accessing their DMS. By eliminating the use of other data integrators, CDK has required dealers who use CDK's DMS also to use CDK's 3PA service.

109. Dealers have repeatedly demanded that CDK and Reynolds stop blocking data integrators. Dealers have made clear that they own the data, that they control access to it, and that disrupting their preferred access methods has impaired their business operations and caused financial harm. But CDK and Reynolds have rejected or ignored the dealers' objections.

110. The dealer complaints are too numerous to fully recount here, but a few examples make the point. In November 2016, one Mercedes dealership in California wrote to CDK: "When will you stop the blocking of our user profiles? This must stop." The dealer decried CDK's "attempt to stop all other data access

routes thereby forcing us to use [CDK's] data monetizing scheme if we want to access our data." As the dealer recognized, the blocking actions were intended to obtain the economic benefits of the dealers' data. "When will CDK stop trying to monetize data owned by [us] at our expense? All being orchestrated under the guise of 'protecting our data.' Frankly most can see right through this propaganda smoke screen. The data could be protected by using available technology that doesn't cut off the dealers' access to their data using fully automated routines."

111. One Virginia dealer asked his employees "to raise holy hell with CDK. This is really affecting our business." And a Lexus dealership in California wrote that "[a]s a dealership owner, I believe that CDK has no right to deny me access to my own data. By extension, I also retain my rights to distribute my data to chosen vendors who meet my strict criteria for data security."

**B. CDK's and Reynolds' Exclusive Dealing Provisions with Vendors and Dealers**

112. Shortly after entering into the Data Exchange Agreement, CDK began forcing vendors to enter into new contracts for the 3PA program. Consistent with its decision to close its DMS, CDK imposed exclusive dealing provisions that required vendors to use 3PA alone to integrate with data on CDK DMSs for all of their products and services. CDK also took the new position that, notwithstanding their plain language, its existing contracts with dealers prohibited allowing data integrators to access CDK DMSs.

1. **CDK Imposes Exclusive Dealing and Price-Secrecy Provisions**

113. AutoLoop's Managed Interface Agreement ("MIA") and accompanying Statement of Work, dated January 12, 2016, includes an exclusive dealing provision in Section 1(f): ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ MIA § 1(f).

114. The exclusive dealing provision purports to apply to nearly every AutoLoop product and service, so that the use of 3PA for any one of AutoLoop's current offerings essentially binds AutoLoop to use 3PA for all existing, and future, offerings. If AutoLoop breaches this provision by using another data integrator, CDK may terminate the entire agreement. *See id.* § 4(g) ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

115. These exclusive dealing provisions even prohibit AutoLoop from sharing dealer data between its own products and services because AutoLoop's solutions cannot receive dealer data from any source other than 3PA, even where each such AutoLoop product or service is separately paying CDK to access the exact same data. Because AutoLoop cannot share data between its solutions, it must pay

for a new 3PA integration interface for each of its solutions. That is a very inefficient and highly anticompetitive process. It also means that CDK can charge repeatedly for access to the same data, in addition to thwarting AutoLoop's ability to integrate its solutions.

116. The new 3PA contract also includes a price-secrecy provision in Section 8: ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Internal CDK documents state the purpose of these provisions is "to create minimal awareness to dealer" regarding CDK's exorbitant pricing for data integration.

117. CDK also imposes exclusive dealing and price-secrecy provisions in its standard 3PA contract with other vendors. The current CDK 3PA contract template states: ████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ *See* CDK 3PA Contract §§ 1(a)(*l*), 2(e). The contract goes on to state that the vendor cannot

████████████████████████████████████████

████████████████████████████████████████

*Id.*

118. The penalty for accessing dealer data other than through CDK's 3PA interface is termination of the entire agreement: ███████████████

████████████████████████████████████████████

████████████████████████████████ *Id.* § 6(g).

119. The exclusive dealing terms in CDK's standard form contract purportedly last forever. The contract template states: ████████████

████████████████████████████████████████████

███████████████████ *Id.* § 6(j). This provision seeks to tie the vendor to the 3PA program indefinitely. Even if a vendor were to stop participating in the 3PA program, it would still be barred from obtaining data from any CDK dealer from any other source. That gives CDK carte blanche to raise integration prices once they enter the 3PA program because vendors need integration with data on the CDK DMS.

120. ████████████████████████████████████████

████████████████████████████████████ *See id.* § 5(d).

121. The standard vendor contract also has a price-secrecy provision. It states that vendors ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████ *Id.* § 10.

122. The CDK standard contract bars vendors from indicating ████████████ that an increase in the price of products or services is related to an increase in the integration fees charged by CDK: ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ *Id.*

### 2. CDK DMS Contracts with Dealers

123. CDK has changed its position on the meaning of its existing contracts with dealers. Those contracts allow "agents" of the dealer – such as data integrators – to access the DMS on the dealer's behalf. Consistent with that provision, CDK had long marketed its DMS as an "open system" that data integrators could access on the dealer's behalf, and dealers relied upon those representations in agreeing to purchase the CDK DMS. But in 2015, CDK began insisting (contrary to the language in the standard contract itself) that its dealer contracts prohibited data integrators other than 3PA, and it began disabling the logins that dealers had provided to third-party data integrators to access the DMS. This has required dealers who are using CDK's DMS to use CDK's 3PA exclusively.

### 3. The Vendor and Dealer Exclusive Dealing Provisions Are Anticompetitive

124. The exclusive dealing provisions are independently anticompetitive. They foreclose all competition in the Dealer Data Integration Market for approximately 40% of dealers who use CDK DMSs (and an even greater percentage

when considered in terms of the number of new cars sold). And they foreclose all competition in the Single-Brand Aftermarket for Dealer Data Integration on CDK DMS. From the perspective of vendors, the foreclosure is even more extreme. If a vendor participates in CDK's 3PA program for even a single CDK dealer, that vendor may no longer access any CDK DMS through any means other than through 3PA for *any* CDK dealer and for *any* product or service. Reynolds also imposes similar exclusive dealing requirements.

## III.   CDK's Actions Have Harmed Competition

125.   CDK's illegal horizontal agreement with Reynolds and its anticompetitive exclusive dealing provisions have severely harmed competition in the Dealer Data Integration Market to the detriment of solutions that rely on data integration services. CDK and Reynolds currently have a monopoly on data integration for their respective DMSs. This monopoly has had predictable effects: prices have skyrocketed and quality has stagnated or even decreased. CDK's internal documents candidly explain that this was precisely CDK's goal. It needed to "close" its DMS because otherwise the dramatically increased prices would cause vendors "to move to [other data integrators] instead of accept increase price."

126.   Even though AutoLoop and other vendors pass through a portion of CDK's and Reynolds' inflated data integration costs to dealers, many vendors (including AutoLoop) have no choice but to absorb some of the increased data integration fees because dealers are unable or unwilling to pay such excessive fees. This results in slashed development budgets, support, and other investments in

their products and services. These cost-cutting measures ultimately reduce the quality of such products and services.

127. The increased data integration prices and reduced quality of data integration services have also "tilted the table" in favor of CDK's own offerings. CDK's products and services do not have to pay excessive data integration fees, and those solutions have near real-time, read and write integration to all necessary dealer data on the DMS.

128. Dealers are on record stating that they do not use some of their preferred vendors because of the huge pass-through data integration surcharges.

129. Additionally, vendors have had to scale back the functionality of their products and services or pull them off the market entirely. For example, at the Authenticom hearing, Alan Andreu of Dominion – a vendor – testified that Dominion had to shutter one application because the cost of integration fees exceeded the cost of the product itself. Likewise, Michael Korp, owner of the vendor Open Recalls, testified that he could not afford CDK's and Reynolds' high integration prices. He had therefore been forced to rely on Authenticom for integration, but CDK's blocking has forced the vendor to lay off employees and halt plans for growth.

## A. Data Integration Prices Have Skyrocketed

130. CDK and Reynolds have drastically increased the prices they charge for their data integration services (3PA and RCI) since 2015. These prices are now far higher than the prices that would exist in a competitive Dealer Data Integration Market.

131.    CDK formally announced a "refreshed" 3PA program on June 22, 2015 – just a few months after its collusive agreement with Reynolds – as part of its "SecurityFirst" initiative.   This initiative used data security as the pretext for "closing" the DMS and imposing massive price increases on vendors.   "CDK is rolling out a new cybersecurity initiative," *Automotive News* reported, "that will raise monthly integration fees for most of the third-party software vendors that dealerships use in addition to CDK software.  It is patterned after a program at Reynolds and Reynolds."  David Barkholz, *CDK Global Sees Earnings Boost from Cost-Cutting, Improved Efficiency*, Automotive News (Nov. 3, 2015).

132.    The industry saw this for what it was.  Vendors and dealers received little, if anything, in return for the dramatically higher prices.    Industry publications likewise reported that, "Vendors briefed on CDK's new data-security program said nothing will change in the way they get data from CDK-served DMS dealerships under SecurityFirst except for a higher price."  David Barkholz, *Dealers Will Pay Up for Vendors' Data Access After CDK Switch*, Automotive News (July 20, 2015).

133.    CDK and AutoLoop began negotiating a 3PA agreement shortly after the launch of CDK's SecurityFirst initiative.   They ultimately entered into a Managed Interface Agreement and accompanying Statement of Work on January 12, 2016.

134.    When AutoLoop joined 3PA in January 2016, CDK charged ███████ per rooftop per month for a dealer buying the entire AutoLoop suite.  CDK increased the

price to ██████ per rooftop per month in July 2016.  Today, CDK charges upwards of

████ per rooftop per month for the full suite of AutoLoop products.  For dealers

buying less than the full AutoLoop suite, the price of integration depends on the mix

of products the dealer uses.  Nonetheless, AutoLoop – and ultimately dealers – must

pay hundreds of dollars per month for even more limited data access.

135.   In many instances, however, AutoLoop receives *nothing* in exchange

for paying 3PA fees.  According to the Statement of Work, ██████████████████

████████████████████████, only seven of which exist today.  *See*, *e.g.*,

Statement of Work at 4-16.  The Managed Interface Agreement provided that

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ MIA Exhibit A – Schedule ¶ 2; *see also* MIA § 1(f) ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████. CDK and AutoLoop also ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ MIA Exhibit A – Schedule.

136.   As of the date of this Complaint – more than two years after CDK and AutoLoop contracted for AutoLoop's products to become certified – CDK has only certified *two* of AutoLoop's solutions – Essentials (marketing) and AutoBook (scheduling).  For the five remaining products, AutoLoop must pay an independent data integrator for service, which CDK allows for the time being.  CDK, however, requires AutoLoop to pay the 3PA integration fees for these five products despite the fact that AutoLoop receives no 3PA service.  AutoLoop is thus required to double pay for data integration – approximately $79 to an independent data integrator and hundreds of dollars more to CDK.

137.   By increasing AutoLoop's integration fees so dramatically, CDK has significantly raised the costs of AutoLoop's applications.  AutoLoop must pass through significant portions of these integration fees to the dealers who purchase these products and services.  AutoLoop passes through a portion of these integration fees as data integration surcharges, and such surcharges are a substantial percentage of the total monthly cost of AutoLoop's DMS-integrated products.

138.   After entering into the unlawful 2015 agreement with CDK, Reynolds has also increased its RCI prices far higher than it could if there were any competition.  Every year, RCI prices increase by approximately four to five percent.  Furthermore, the year after the CDK and Reynolds agreement, Reynolds began charging AutoLoop a fee for each "transaction" between AutoLoop's applications and the Reynolds DMS.  In other words, Reynolds now charges AutoLoop an additional

fee every time certain of its applications accesses the DMS. As of mid-2017, these fees were ███████ per transaction. For applications that require frequent communication with the DMS – such as scheduling software – transaction fees *alone* can cost AutoLoop hundreds of dollars per dealer per month. Given the combination of Reynolds' exorbitantly high standard integration fees and its transaction fees, many dealers pay more in fees than AutoLoop charges for its products.

139. AutoLoop is not alone in being forced to pay these extreme prices. For example, at the Authenticom hearing, a witness for vendor Dominion Enterprises testified that his company paid $30 per dealer per month for data integration with Authenticom, but now is paying CDK ████████████████ for the same service.

140. CDK has also engaged in deceptive advertising. As part of the revamped 3PA program, CDK posted a pricing guide on its website that CDK represents as "standardized" pricing for all vendors. "Our 3PA pricing philosophy is simple," CDK states in its program guide, "standardized pricing for all customers." But that is false, and misleads dealers about real 3PA prices. CDK's internal documents show that, for competitors like AutoLoop, the actual 3PA fees charged by CDK are far in excess of its published "standard" pricing packages. CDK told another vendor providing electronic vehicle registration and titling that the vendor would have to pay 25% of its top-line revenues to participate in the 3PA program, which is many times more than the posted "standard" pricing.

141. More egregious still, CDK has refused to provide integration for data elements if the data will be used in an application that competes against one of CDK's applications. For example, AutoLoop has requested to be able to modify an open repair order in the service lane for one of its solutions, and CDK has refused that request.

142. In addition to these monthly fees, CDK also charges vendors enormous upfront fees to initiate services. CDK charged AutoLoop ███ to join the 3PA program, with "setup" fees of around ███ (or more) per dealership rooftop. These initiation fees are much more than anything correspondingly charged by independent data integrators.

143. The current 3PA and RCI prices are much higher than the prices that were charged by competing data integrators prior to CDK's and Reynolds' illegal agreement in 2015. For example, between 2008 and 2016, SIS charged around $40 per dealer per month for pulling data and $70 per dealer per month for bi-directional, read-write integration, which included the ability to share data between AutoLoop's solutions. Similarly, Authenticom charged vendors $25 per dealer per month for one data feed and $50 per dealer per month for two or more (up to seven). On average, Authenticom charged vendors between $30 and $40 per dealer per month, and $75 per dealer per month for bi-directional, read-write integration.

144. CDK's prices for the 3PA program stand in stark contrast to the prices CDK charges for data integration services for non-CDK and non-Reynolds DMSs.

DMI and IntegraLink charge between $25 and $50 per dealer per month for non-CDK and non-Reynolds DMSs.

**B. CDK's and Reynolds' Anticompetitive Conduct Has Tilted the Table in Favor of Their Applications to the Detriment of Competing Applications**

145. As of 2015, third-party applications, like those offered by AutoLoop, had been growing steadily due, in part, to reliable third-party integration to dealer data. CDK and Reynolds have attempted to stop that by providing their own products and services with preferential data access and ubiquitous read-write permissions through a "tilt-the-table" approach. Malcolm Thorne, CDK's former chief strategy officer, has admitted under oath that 3PA "protect[ed] CDK products through a tilt-the-table approach." Dkt. No. 163, at 140:11-25. And CDK's internal documents state that one of the "3PA Program Principles" is to "[p]rotect CDK Products through a 'tilt-the-table' approach" and to "[k]eep value add advantage to CDK-layered applications." *Id.* at 139:2-140:25.

146. CDK restricts AutoLoop's access to and rights regarding dealer data on the DMS for no reason other than to make AutoLoop's offerings more difficult to use or to reduce the features and functionality of those products, thereby harming AutoLoop, and providing an artificial advantage to CDK's own competing products and services.

147. For example, CDK withholds from AutoLoop the ability to create and modify repair orders using its SmartLane program, even though CDK has enabled this capability for its own competing program, Service Edge. There is no justification for doing so other than to give CDK's Service Edge a leg up in its

competition against AutoLoop. Similarly, CDK does not allow customers to sign repair orders in the dealer's service lane, even though that capability is available in Service Edge. These artificial capability restrictions insulate CDK's applications from having to compete on their merits against AutoLoop's products.

148. CDK actively markets Service Edge by pointing to the artificial functionality limitations imposed by CDK on Service Edge's competitors. For example, one marketing presentation depicts the following:

**Missing Features Compared to CDK Service Edge**

| | Feature | Impact |
|---|---|---|
| 2 | Bi-directional integration to DMS. Read and Write-back data | CDK Service Edge workflow is written into DMS. No need to do the same work twice. |
| | *Repair Order Creation* | Service Edge is the only solution that can open a Repair Order outside of the DMS |
| | *Electronic payments posted directly to accounting G/L (competitor requires additional manual processing to DMS)* | Non-CDK solutions require additional manual step |
| 5 | Digital Signature capture on RO's and Vehicle Walkaround | Customers electronically sign RO's, Invoices and Inspection forms. Immediately available in DMS. |
| 9 | Cost | CDK bundles appointments, lane inspection, electronic MPI and electronic payments into one affordable payment. Also eliminates any 3rd party ingtegration charges. Nissan Newport News bundle is much less than 3rd party pricing. |

149. As another example of "tilting the table," CDK limits how frequently its applications can send data to, or receive data from, the DMS. Whereas independent integrators like SIS were able to exchange data with the DMS in less

than 30 seconds, AutoLoop's contract with CDK limits data exchanges to once every 15 minutes. CDK's own applications, however, are able to communicate with the DMS in near-real-time.

150. CDK also forces AutoLoop to go through onerous 3PA "certification" exercises that serve no purpose other than to provide CDK with valuable and confidential proprietary information about AutoLoop's products. CDK has demanded that AutoLoop: (a) provide proprietary information about the functionality of AutoLoop's products; (b) conduct live demonstrations of its products during which CDK employees ask detailed questions about AutoLoop's technology; (c) provide a "workflow" model showing how each AutoLoop product uses data; and (d) justify how the AutoLoop product will use each data element. CDK has refused to confirm that it will not use AutoLoop's proprietary information to gain a competitive advantage against AutoLoop.

151. These actions not only cause AutoLoop significant harm but they also leave dealers with fewer and lower quality options.

## IV. CDK's Anticompetitive Conduct Has No Pro-Competitive Justification

152. There are no pro-competitive justifications for CDK's anticompetitive behavior. CDK has claimed that "closing" the DMS is necessary to protect "data security" because, it asserts, other data integrators are "unsecure." But that is simply not true.

153. First, there is nothing unusual or unsecure about third parties integrating with the DMS on the dealer's behalf. CDK itself owns two data

integrators (DMI and IntegraLink) that interact with and syndicate data in the same way as other data integrators. Malcolm Thorne – CDK's then chief strategy officer – told *Automotive News* in March 2015 that "the pull process of extracting data is as safe as pushing out." David Barkholz, *Dealerships Work To Safeguard Data as Security Breaches Loom*, Automotive News (Mar. 9, 2015). Indeed, until they entered their agreement in February 2015, CDK pulled data using login credentials from Reynolds dealers (and still does today pursuant to the "wind down" agreement). And Reynolds for over a decade consistently allowed third-party access to its DMS. It was only after Mr. Brockman acquired Reynolds in 2006 that it changed its position with respect to competitors' access. Similarly, a top-level CDK executive admitted in private conversation with a vendor that the rhetoric around "security" has "little credibility" and is primarily designed to force vendors to use CDK for data integration.

154. Significantly, while CDK's own SecurityFirst initiative itself recommended improving third-party integration practices and retiring "certain integration that risks data security," it did not recommend terminating all third-party integration.

155. Second, using independent integrators to enable data flow between parties is standard across industries, including in banking and healthcare, where the data is much more sensitive than anything accessible from dealers. Taking the banking industry as an example, thousands of third party products and services – from well-established companies like PayPal, Mint, Square, and Quicken to new

startups like Even – require access to a customer's banking data. There are large data integrators like Intuit and Yodlee that pull data from the consumers' bank accounts and provide that data to the third-party applications. As the Consumer Financial Protection Bureau stated, "the availability of consumer financial account data . . . has made possible a range of benefits to consumers." *Consumer Access to Financial Records*, Request for Information, Bureau of Consumer Financial Protection, Docket No. CFPB-2016-0048, at 7 (Nov. 17, 2016).

156. Third, at the Authenticom hearing, CDK was unable to offer a single example of a data-security incident involving any independent data integrator. *See* Op. & Order, *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, 2017 WL 3017048, at *2 n.2 (July 14, 2017). Reynolds could cite only a single incident (not involving data security) in which a query became stalled, but the problem was quickly and easily resolved. This is not surprising given that the methods used by third parties to integrate with the DMS are standard methods employed by integrators in multiple industries. CDK has never explained why the standard methods that work in other industries do not work here.

157. Fourth, CDK has allowed AutoLoop to use another independent integrator (SIS) as long as AutoLoop pays the 3PA integration fees. CDK "whitelists" SIS from its usual blocking practices. This shows that profit – not security – is the sole motivation for the 3PA program.

158. Fifth, throughout CDK's onerous 3PA certification process, CDK does not ask any questions actually related to AutoLoop's security practices, such as how

it secures data it retrieves from the DMS during transit and storage. Rather, CDK seeks proprietary information about the functionality of AutoLoop's applications – the type of information one would want to know about a competitor's products in order to gain a competitive advantage against AutoLoop.

159. Sixth, CDK also uses third-party integration to non-CDK DMS to pull data for *their own standalone products and services*. For example, CDK and Reynolds pay Authenticom to pull data from dealerships using their DMSs and to distribute that data to their applications. And DMI continues to screen scrape data from the Reynolds DMS during the five-year wind-down period pursuant to the February 2015 agreement. The fact that Reynolds and CDK actually use third-party access themselves proves there is nothing inherently "unsecure" about it.

160. In fact, CDK's insistence that vendors integrate with dealer data only through the 3PA program actually imposes unnecessary burdens on the underlying systems. Instead of querying the DMS once, and syndicating any data that is pulled to all vendors that need it, CDK requires every product and service to impose upon the network for the exact same data. That serves no purpose other than to allow CDK to reap a financial windfall by charging each vendor for integration with the same underlying data. For these reasons, the district court in the Authenticom matter concluded that CDK had failed to present evidence of a procompetitive justification for its anticompetitive acts.

161. Finally, CDK has failed to implement less-restrictive means of protecting dealer data. For example, CDK could establish application programming

interfaces ("APIs") for independent integrators. Indeed, before entering the agreement with Reynolds, CDK even advocated that DMS providers should offer APIs for third-party integrators. Other DMS providers regularly provide API access for third-party integrators. Alternatively, other DMS providers also allow for dealers and vendors to utilize APIs between them directly, which is another less-restrictive means.

**COUNT I:**
**HORIZONTAL CONSPIRACY IN VIOLATION OF**
**SECTION 1 OF THE SHERMAN ACT**

162. Plaintiff incorporates by reference the preceding allegations.

163. CDK and Reynolds entered into and engaged in an agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

164. CDK and Reynolds are horizontal competitors of one another in the DMS market and the Dealer Data Integration Market.

165. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding, or concerted action to eliminate competition in the Dealer Data Integration Market and their respective brand-specific aftermarkets. In furtherance of that conspiracy, in February 2015, CDK and Reynolds entered into a written market division agreement pursuant to which they agreed to "close" their DMSs and not to compete in the Dealer Data Integration Market. CDK and Reynolds also engaged in a group boycott to block all third-party access to their respective DMS. The agreement not to compete between CDK and Reynolds is a

per se violation of the Sherman Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

166. The purposes of the conspiracy between CDK and Reynolds include (1) to protect their DMS duopoly (thereby protecting their monopoly profits), (2) to protect their standalone applications, and (3) to monopolize the Dealer Data Integration Market so that they can reap monopoly profits.

167. Through their conspiracy, CDK and Reynolds have caused actual injury to competition for applications and in the Dealer Data Integration Market and respective aftermarkets.

168. The CDK and Reynolds agreement has cut off access to dealer data that solution providers need in order to compete with CDK and Reynolds.

169. CDK and Reynolds possess dominant positions in the DMS market, which they have utilized to further the conspiracy.

170. CDK's and Reynolds' conspiracy and anticompetitive conduct in furtherance thereof do not enhance efficiency or competition in any market. On the contrary, their conduct has produced only anticompetitive effects.

171. As a proximate result of CDK's and Reynolds' unlawful conduct, for which CDK is jointly and severally liable, AutoLoop has suffered injury to its business or property in an amount to be proven at trial and automatically trebled.

## COUNT II:
## UNLAWFUL RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

172. Plaintiff incorporates by reference the preceding allegations.

173.   CDK entered into contracts with dealers and vendors that contain exclusive dealing provisions that unreasonably restrict trade or commerce in violation of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

174.   CDK's contracts with dealers provide that dealers cannot provide any third parties with access to the DMS.  Likewise, the contracts with vendors provide that vendors cannot access the DMS except through 3PA.  These provisions are standard throughout CDK's contracts with dealers and vendors.

175.   CDK was able to impose these exclusive dealing provisions on dealers and vendors as a result of its market power in the DMS market and the respective dealer data integration aftermarket.

176.   Because CDK imposed these exclusive dealing provisions pursuant to its conspiracy with Reynolds to eliminate competition, they are per se illegal. Nevertheless, whether entered into pursuant to CDK's agreement with Reynolds or independently, CDK's vertical restraints are unlawful because they have led to increased prices and reduced output.

177.   Through its exclusive dealing provisions, CDK has injured competition in the DMS and Dealer Data Integration markets.

178.   CDK's exclusive dealing agreements do not enhance efficiency or competition in any market.  On the contrary, the agreements have produced only anticompetitive effects.

179.   As a proximate result of CDK's unlawful conduct, AutoLoop has suffered injury to its business or property in an amount to be proven at trial and automatically trebled.

## COUNT III:
## UNLAWFUL TYING IN VIOLATION OF
## SECTION 1 OF THE SHERMAN ACT

180.   Plaintiff incorporates by reference the preceding allegations.

181.   CDK has imposed an unlawful tying arrangement on dealers in violation of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

182.   CDK has market power in the DMS market.  When a dealer purchases CDK's DMS, CDK also forces the dealer to rely on CDK's data integration product, 3PA.  Dealers have no choice to utilize other data integration products for CDK's DMS.

183.   Dealers, not vendors, make the decision regarding which data integration product to "purchase."  Dealers must provide authorization for any data integrator to access a DMS, and a vendor cannot use a data integrator that a dealer has not approved.  Accordingly, the dealer is the purchaser of both the tying product (the DMS) and the tied product (data integration).

184.   CDK has sufficient market power in the tying market (DMS) to appreciably restrain free competition in the market for the tied product (data integration).  CDK has demonstrated its ability to leverage their market power in the tying market to control prices and exclude competition in the tied market.

185. CDK's tying arrangement has affected a substantial amount of commerce in the market for the tied product.

186. Although vendors often pass through a portion of the costs of data integration to the dealer, this tying arrangement directly harms vendors like AutoLoop because those vendors are: (i) at a competitive disadvantage versus CDK's corresponding products and services (because such products and services do not incur integration fees); (ii) not able to pass through all data integration costs; and (iii) less able to allocate funding to develop new products, services, functionality, and features.

187. As a proximate result of CDK's unlawful tying arrangement, Plaintiffs have suffered injury to their business or property in an amount to be proven at trial and automatically trebled.

### COUNT IV:
### UNLAWFUL MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

188. Plaintiff incorporates by reference the preceding allegations.

189. CDK has unlawfully monopolized the aftermarket for dealer data integration services with respect to dealer data stored on the CDK DMS, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

190. When dealers purchase DMS services from CDK, they are "locked in" to that purchase through a long-term contractual relationship and high switching and information costs.

191. Because of customer lock-in in the primary DMS market, CDK has monopoly power – and in fact has monopolized – the Dealer Data Integration

aftermarket on its DMS platform. CDK has demonstrated its ability to control prices and exclude competition by blocking third-party access to their DMS by raising data access fees to supracompetitive levels.

192. CDK used anticompetitive means to acquire and maintain its monopoly, including, *inter alia*, by blocking third-party access to the DMS, entering into a market division agreement pursuant to which it agreed with Reynolds that neither DMS provider would provide third-party access to the other's DMS, and imposing anticompetitive exclusive dealing arrangements on vendors and dealers.

193. As a direct and proximate result of CDK's monopolization, AutoLoop has suffered damage to its business or property in an amount to be proven at trial and automatically trebled.

### COUNT V:
### VIOLATION OF THE FLORIDA ANTITRUST ACT

194. Plaintiff incorporates by reference the preceding allegations.

195. CDK and non-defendant co-conspirator Reynolds engaged in a conspiracy in unreasonable restraint of trade in violation of the Florida Antitrust Act, Fla. Stat. Ann. § 542.15 *et seq.*, for all the reasons set forth in the preceding allegations. This conspiracy is a per se violation of the Florida Antitrust Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce. CDK's exclusive dealing requirements and monopolization of the aftermarket for dealer data integration services are also unlawful under the Florida Antitrust Act.

196. A substantial portion of the unlawful and unfair acts and practices alleged herein occurred in Florida – where numerous dealers and AutoLoop are

located – and harm to AutoLoop, car dealers, and car buyers was suffered in Florida.

197.    As a direct and proximate result of CDK's unlawful conduct, AutoLoop has suffered injury to its business or property.  AutoLoop is entitled to treble damages for the violations of the Florida Antitrust Act alleged herein.

**COUNT VI:**
**UNFAIR PRACTICES IN VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

198.    Plaintiff incorporates by reference the preceding allegations.

199.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") defines "unfair competition" to include, among other things, any "unfair methods of competition" and "unfair or deceptive acts or practices."  Fla. Stat. Ann. § 501.204.

200.    CDK's acts and practices as alleged herein have been "unfair" under the FDUTPA.  CDK's conduct – for instance, its "tilt-the-table approach" in placing anticompetitive restrictions on competing services and products that it does not place on its own corresponding products – offends established public policy (including federal and state antitrust statutes) and significantly threatened and harmed consumers of both data integration services and the products and services that rely on those services.  Furthermore, any utility from CDK's conduct does not outweigh the harm it causes to competitors, car dealers, and car buyers.

201.    A substantial portion of the unfair acts and practices alleged herein occurred in Florida, and the harm to application providers, car dealers, and car

buyers was inflicted in Florida for all the reasons set forth in the preceding allegations.

202.  As a direct and proximate result of CDK's unfair conduct, AutoLoop has suffered injury to its business or property.  AutoLoop is entitled to restitution in an amount to be proven at trial.

## JURY DEMAND

203.  In accordance with Federal Rule of Civil Procedure 38(b), AutoLoop demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, AutoLoop requests that the Court:

(a)     decree that CDK entered into an unlawful horizontal conspiracy with Reynolds in violation of Section 1 of the Sherman Act;

(b)     decree that the exclusive dealing provisions in CDK's contracts with AutoLoop, other vendors, and dealers are anticompetitive and illegal restrictions of trade under Section 1 of the Sherman Act;

(c)     decree that the tying provisions in CDK's contracts with AutoLoop are anticompetitive and illegal restrictions in trade under Section 1 of the Sherman Act;

(d)     decree that CDK has illegally monopolized the market for integration services for dealer data stored on its DMS platform under Section 2 of the Sherman Act;

(e)     enjoin the enforcement of the exclusive dealing provisions in the CDK contracts with dealers and vendors;

(f)    enjoin CDK from privileging its own products and services – as compared to AutoLoop's products and services – with respect to integration with data elements stored on mutual dealer clients' DMSs, including with respect to data access and usage rights, and bi-directional integration;

(g)    award AutoLoop damages, as provided under the Sherman Act and the Florida Antitrust Act, and hold CDK jointly and severally liable for all damages resulting from CDK's unlawful conspiracy in restraint of trade with Reynolds, to be entered against CDK in an amount to be trebled in accordance with the Sherman Act and the Florida Antitrust Act;

(h)    award appropriate actual and punitive damages for CDK's common law violations;

(i)    award AutoLoop its reasonable costs and expenses incurred in this action, including expert fees and attorneys' fees;

(j)    award AutoLoop prejudgment interest; and

(k)    award AutoLoop any such further relief that the Court may deem just and proper.

April 9, 2018                                   Respectfully submitted,

                                                /s/ Richard J. Prendergast
Jennifer L. Gregor                              Richard J. Prendergast
Kendall W. Harrison                             Michael T. Layden
Allison W. Reimann                              Collin M. Bruck
GODFREY & KAHN S.C.                             RICHARD J. PRENDERGAST, LTD.
One East Main Street                            111 W. Washington Street, Suite 1100
Suite 500                                       Chicago, Illinois 60602
Madison, Wisconsin 53703                        Telephone: (312) 641-0881
Telephone: (608) 284-2629                       rprendergast@rjpltd.com
Fax: (608) 257-0609                             mlayden@rjpltd.com
jgregor@gklaw.com                               cbruck@rjpltd.com
kharrison@gklaw.com
areimann@gklaw.com                              Michael N. Nemelka (*pro hac vice pending*)
                                                Derek T. Ho (*pro hac vice pending*)
                                                Aaron M. Panner (*pro hac vice pending*)
                                                David L. Schwarz (*pro hac vice pending*)
                                                Kevin J. Miller (*pro hac vice pending*)
                                                Daniel V. Dorris (*pro hac vice pending*)
                                                Joanna T. Zhang (*pro hac vice pending*)
                                                Joshua Hafenbrack (*pro hac vice pending*)
                                                Daniel S. Guarnera (*pro hac vice pending*)
                                                KELLOGG, HANSEN, TODD,
                                                  FIGEL & FREDERICK, P.L.L.C.
                                                1615 M Street, N.W., Suite 400
                                                Washington, D.C. 20036
                                                Telephone: (202) 326-7900
                                                Fax: (202) 326-7999
                                                mnemelka@kellogghansen.com
                                                dho@kellogghansen.com
                                                apanner@kellogghansen.com
                                                dschwarz@kellogghansen.com
                                                kmiller@kellogghansen.com
                                                ddorris@kellogghansen.com
                                                jzhang@kellogghansen.com
                                                jhafenbrack@kellogghansen.com
                                                dguarnera@kellogghansen.com

                                                *Counsel for Plaintiff Loop, LLC,
                                                d/b/a AutoLoop*